```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF RHODE ISLAND
_____
                                    )
LEILA C. SINCLAIR,                  )
                                    )   C.A. No. 16-127 WES
        Plaintiff,                  )
                                    )
    v.                              )
                                    )
CRAIG S. SAMPSON, ESQ.,             )
KATHLEEN J. ENNEN, WILLIAM E.       )
JENKINS, THEODORE L. JENKINS JR.,   )
and AMERICAN NATIONAL INSURANCE     )
COMPANY,                            )
                                    )
        Defendants.                 )
_____)
```

## MEMORANDUM AND ORDER

WILLIAM E. SMITH, Chief Judge.

> We asked a gentleman by us if he knew what cause was on. He told us Jarndyce and Jarndyce. We asked him if he knew what was doing in it. He said really, no he did not, nobody ever did, but as well as he could make out, it was over. Over for the day? we asked him, No, he said, over for good.

Charles Dickens, Bleak House 911 (Signet Classics 2011) (1853).

Such is the denouement the Court hopes here to hasten in this case. It is – like Jarndyce and Jarndyce – a suit regarding inheritance and with competing testaments, and also one litigated through "trickery, evasion, procrastination, spoliation, botheration, under false pretences of all sorts." Id. at 13. Fortunately, though, this is not nineteenth-century Chancery Court applying "[t]he one great principle of the English law . . . to make business for itself," id. at 579, but a court compelled "to

secure the just, speedy, and inexpensive determination of every action and proceeding," Fed. R. Civ. P. 1.

I. Background

Given that "every difficulty, every contingency, every masterly fiction, every form of procedure known . . . is represented over and over again" in this case,[1] Dickens, supra, at 29, the material facts are somewhat involved. But at bottom, this is a fight among siblings about who should control the remaining balance of their late mother's annuity.

Plaintiff Leila Sinclair and Defendants Kathleen Ennen, William Jenkins, and Theodore Jenkins Jr. are all children of the late Kathleen and Theodore Jenkins. (Sibling Defs.' Statement of Material Facts Not in Dispute ("SSMF") ¶¶ 1, 6, ECF No. 154; see American National Insurance Company's Statement of Material Facts Not in Dispute ("ASMF") ¶¶ 5–6, ECF No. 152.) On August 6, 2010, at the behest of Kathleen Jenkins, Defendant American National Insurance Company ("ANICO") sold an annuity for $384,993.92 to the Theodore Lock Jenkins Trust ("TLJ Trust"). (ASMF ¶ 6; ASMF Ex. 2 at 6, 13, ECF No. 152-2.) The TLJ Trust had been born of Theodore Jenkins's will when he passed in 1988, and had Kathleen Jenkins and Sinclair for trustees. (ASMF ¶ 5; ASMF Ex. 1 at 3, ECF No. 152-1.) The TLJ Trust directed that income from its assets –

---

[1] In addition to the motions discussed herein, one for injunctive relief has already been heard and denied. (See Order, ECF No. 45.)

2

including from the annuity – be paid for Kathleen Jenkins's benefit. (See ASMF Ex. 1 at 22.) And indeed, the annuity itself required that Kathleen Jenkins, as annuitant, receive periodic payments from its corpus, (ASMF Ex. 2, at 5), and that upon her death her children, as the annuity's beneficiaries, would each receive a quarter of whatever remained, (id. at 15).

Such was the arrangement, anyway, before Kathleen Jenkins created the Kathleen Ennis Jenkins Trust ("KEJ Trust") and appointed Sinclair her attorney-in-fact, in May 2013. (ASMF ¶¶ 7, 10.) Sinclair was named trustee to the KEJ Trust, a position that assumed an importance as to the annuity when, in November 2014, Sinclair – using her newly coined power-of-attorney – surreptitiously changed the annuity's beneficiary designation from the four children to the KEJ Trust. (Id. ¶ 8, 11.) A secret coup, but one for whose fruits Sinclair was impatient. Because rather than wait patiently for her mother to die and the annuity to fall – naturally, so to speak – into the KEJ Trust, Sinclair began in November 2014 to request withdrawals from the annuity. (Id. ¶ 12.) Ten in all and totaling $192,750, the checks were made payable to the KEJ Trust and sent to its trustee, Sinclair. (Id.)

Kathleen Jenkins died November 18, 2015. (Id. ¶ 14.) On December 28, 2015, eager to collect what was left of the annuity, Sinclair submitted a claim on behalf of the KEJ Trust to ANICO. (Id.) She sent paperwork including Kathleen Jenkins's death

3

certificate and a copy of the deed to the KEJ Trust.  (Id.)  The next day Jenkins Jr. – suddenly awake to at least some of Sinclair's intrigues – phoned ANICO to say that he was contesting the power-of-attorney that enabled Sinclair to change the annuity beneficiary from the children to the KEJ Trust.  (Id. ¶ 15.)  ANICO informed Jenkins Jr. that Sinclair was one step ahead of him, having already submitted a claim for the annuity.  (Id.)

Two days later, in a remarkable turn, ANICO received a letter from Defendant Craig Sampson, a lawyer for Jenkins Jr.  (Id. ¶ 16.)  The letter highlighted part of the KEJ Trust deed Sinclair had overlooked:  clause 7, which created the office of Appointer.  (ASMF Ex. 11 at 3-4, ECF No. 152-11; ASMF Ex. 3 at 9, ECF No. 152-3.)  According to the deed, the Appointer had nearly unfettered power to remove and appoint trustees to the Trust.  (ASMF Ex. 3 at 9.)  And, the letter continued, the deed had William Jenkins, Jenkins Jr.'s brother, designated Appointer.  (Id. at 20; ASMF Ex. 11 at 3-4.)  Attached to Sampson's letter was a copy of a memorandum signed by William Jenkins and sent to Sinclair, removing her as trustee of the KEJ Trust and appointing Sampson in her stead. (ASMF Ex. 11 at 4.)

Soon thereafter, on January 4, 2015, Sampson exercised his power as trustee by submitting a claim to ANICO for the annuity.  (ASMF ¶ 17.)  Sampson received the $215,274.18 that remained in the investment via check dated January 14, 2016.  (Id. ¶ 19.)

Before doing so, however, ANICO wrote and took a call from Sinclair as a courtesy, to tell her she had been supplanted pursuant to clause 7 of the KEJ Trust, and that the company was therefore sending the annuity proceeds to the newly appointed trustee. (Id. ¶¶ 19-20.)

Not content to wonder at the irony of it all, Sinclair mailed ANICO what she represented was a later version of the KEJ Trust deed, purportedly executed in September 2013, several months after the original. (Id. ¶ 21.) This version was curious for its having a signature page identical to that of the original, that is, the one submitted to ANICO by both Sinclair and Jenkins Jr. in December 2015 as part of their competing annuity claims. (Id.) Although unlike the original, this new version – surprise, surprise – had swapped William Jenkins out for another Appointor, and limited the Appointer's power to install new trustees to situations where the sitting trustee either died or expressly consented to the appointment. (Id.; ASMF Ex. 17 at 9, 20, ECF No. 152-17.)

All except Sinclair considered this second deed a dead letter: ANICO had already disbursed the annuity's funds to Sampson, and Sinclair's siblings had by then developed a deep distrust of her handling of their mother's estate. Struggling to breathe life into her piece of paper, and recapture her siblings' attention, Sinclair filed suit. (Pl.'s Compl., ECF No. 1.)

5

II. Discussion

Of the remaining "stages of an endless cause," the Court first runs its "head[] against walls of words" to do with the three pending summary-judgment motions, (ECF Nos. 151, 153, 155). Dickens, supra, at 10. The rest – the motions to strike (ECF No. 177), to amend (ECF Nos. 182, 187), to supplement (ECF No. 194), and for sanctions (ECF Nos. 106, 195) – are treated afterward, mostly in the margins.

    A.   Summary Judgment

Summary judgment is appropriate, of course, when both the record fails to manifest a genuine issue of material fact and the movant is entitled to judgment as a matter of law. See Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017).

    1.   Sinclair's Claims

Sinclair asserts claims of negligence, conversion, larceny, fraud, breach of contract, and for declaratory judgment. (See Pl.'s Am. Compl. ¶¶ 39–70, ECF No. 50.) All these sprout from the same seed, namely, Sinclair's allegation that the second, September 2013 version of the KEJ Trust deed was the operative one. (See id. ¶¶ 10–35.) Sinclair argues essentially that defendants – enabled by ANICO's negligence – used the original version of the deed to push her out of the way so that her siblings could take control of the annuity. (See id.) It is because Sinclair is wrong about which deed controlled that her claims fail.

6

The original KEJ Trust deed memorialized the settlement of a Trust with one dollar and a highboy, both provided by Kathleen Jenkins. (ASMF Ex. 3 at 25–26.) The deed provided that Sinclair would serve as trustee, and that she would administer the res for the benefit of all Kathleen Jenkins's children. (Id. at 20.) In addition to making Sinclair trustee, the original deed – which no one disputes became effective when it was signed and notarized in the middle of May 2013 – named William Jenkins the Trust's Appointor. (Id.) The Appointor, according to the deed's clause 7, had the "[p]ower of appointment," that is, "[t]he power to appoint a new trustee in place of the Trustee [i.e., Sinclair] . . . and the power to remove the Trustee." (Id. at 9.)

The Appointor enjoyed a measure of independence in the discharge of his duties: in the section discussing amendment, the deed makes only two of its clauses immutable, one being clause 7. (Id. at 12.) And not only was the Appointor protected from being amended out of the deed, any otherwise permissible amendment was subject to his veto: clause 10 stated that the way to "alter, vary, or revoke" the Trust was for the trustee to do so "with the written consent of the Appointor." (Id.)

Here, where a settlor creates an inter vivos trust by written instrument, "the terms of the trust are determined by the provisions of the instrument . . . and such other evidence of the intention of the settlor with respect to the trust as is not

7

inadmissible." Restatement (Second) of Trusts § 4 cmt. d (Am. Law Inst. 1959); see also Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 112 (1989). A court may only look outside the four corners of the deed to resolve patent ambiguity. See In re Pack Monadnock, 790 A.2d 786, 789 (N.H. 2002) ("In ascertaining the settlor's intent, extrinsic evidence may not be used to vary or contradict the express terms of the trust."). Moreover, and particularly relevant in this case, if the trust deed specifies amendment procedures, these must be followed to effect an amendment. Union Tr. Co. v. Watson, 68 A.2d 916, 919 (R.I. 1949).

All bad news for Sinclair: trust law is saying the cornerstone of her case – the second version of the deed – was quarried ultra vires. The original Appointor, William Jenkins, never signed off on the purported changes made in the second version, (SSMF ¶ 11), as clause 7 of the original deed required. And even if he had, clause 10 of the original deed is clear that clause 7 is not to be changed. The original KEJ Trust deed, therefore, was the going document in December 2015, when William Jenkins wielded his power as Appointor to remove Sinclair as trustee and name Sampson her successor.[2] In short, the defendants

---

[2] Sinclair's attempts (Mot. for Leave to Amend 1, ECF No. 182; Mot. for Leave to Amend 1, ECF No. 187) to amend her summary-judgment materials – by belatedly swapping out her initial briefing and statements of disputed fact for updated versions – are not something the Court will abide, especially from a litigant with a history of cynically switching positions. See Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner, 101 F.3d 145, 151 (D.C. Cir.

acted at all times within their rights regarding the KEJ Trust and the annuity, leaving Sinclair without legitimate complaint.

The Court will grant defendants summary judgment as to all Sinclair's claims.

### 2. Sibling Defendants' Crossclaims

The sibling defendants have brought crossclaims against ANICO for negligence and breach of contract. (Crosscl. ¶¶ 19-34, ECF No. 34.) They are upset about the $192,750 Sinclair quietly siphoned off the annuity from October 2014 to November 2015. (Id. ¶¶ 12-18.) They believe ANICO breached its duty of care as well as the annuity contract when it allowed Sinclair to change the annuity's beneficiary from Kathleen Jenkins's children to the KEJ Trust, into which Sinclair deposited the withdrawals. (Id. ¶¶ 19-29.)

Their grievance is sympathetic, but not something that can survive summary judgment. As trustee of the TLJ Trust, Sinclair owed fiduciary duties to the Trust's beneficiaries. See, e.g., Restatement (Third) of Trusts § 78 (Am. Law Inst. 2007) ("[A] trustee has a duty to administer the trust solely in the interest

---

1996) ("[A] district court need not relinquish control of its docket to a party who repeatedly fails to comply with the court's procedures." (citing Redfield v. Ystalyfera Iron Co., 110 U.S. 174, 176 (1884))); see also Partridge v. Am. Hosp. Mgmt. Co., 289 F. Supp. 3d 1, 11 (D.D.C. 2017) ("A court may . . . strike an untimely filing or decline to allow a party to supplement a filing when doing so promotes the fair and efficient administration of justice."). Denial of these motions will moot ANICO's one to strike (ECF No. 177).

of the beneficiaries . . . ."). And if her manipulation of the annuity – when held in the TLJ Trust – constituted a breach of these duties, she may be personally responsible for the resulting damages, including value the Trust lost as a result of her breach. Id. § 100 cmt. b (Am. Law Inst. 2012) ("[T]he liability of a trustee who . . . committed a breach of trust is the amount required to restore the values of the trust estate and its distributions to what they would have been if the affected portion of the trust estate had been properly administered.").

But ANICO, as a third party, cannot be liable for breach of trust, and in fact cannot be liable as accessory to breach if it was "without knowledge or reason to know that [Sinclair was] acting improperly." Id. § 108. Moreover, ANICO was under no obligation to "inquire into the extent of the trustee's powers or the propriety of their exercise," or "to see that assets transferred to the trustee [were] properly applied to trust purposes."[3] Id.; id. at cmt. d; cf. Restatement (Second) of Trusts § 324 cmt. g (Am. Law Inst. 1959) ("If a bank in which trust funds have been deposited makes payment on the checks of the trustee without notice that the trustee is committing a breach of trust in making the

---

[3] The annuity contract does nothing to bend these default rules to the siblings' benefit, stating instead that ANICO "will not be . . . in any way obligated . . . to any beneficiary" of the TLJ Trust. (ASMF Ex. 2 at 7.) Their breach-of-contract claim fares no better than the one sounding in negligence.

withdrawals or intends to misapply the funds so withdrawn, the bank is not liable for participation in the breach of trust.").

So, for example, ANICO was not obligated to forage the law books to find an answer to the serious question whether Sinclair was within her rights to sign the annuity withdrawal slips for her co-trustee – that is, her mother – who had granted Sinclair broad power-of-attorney.[4] Compare United States v. Murray, 217 F.3d 59, 64 n.3 (1st Cir. 2000) ("The common law rule is that private trustees must act by unanimity unless the trust instrument provides otherwise."), and Restatement (Third) of Trusts § 81 (Am. Law Inst. 2007) ("If a trust has more than one trustee, except as otherwise provided by the terms of the trust, each trustee has a duty and the right to participate in the administration of the trust."), with (ASMF Ex. 5 at 5, ECF No. 152-5) (granting Sinclair power of attorney to "act . . . [u]nilaterally in all [Kathleen Jenkins's] affairs on an unrestricted basis," which power specifically included that to "mak[e] decisions regarding the [TLJ] Trust" "on [her] behalf.").

---

[4] This question, incidentally, is why ANICO's citation to R.I. Gen. Laws § 18-4-16 is glib, (see Def. ANICO's Mem. in Supp. of Mot. for Summ. J. 16–17, ECF No. 151-1), as that statute absolves third parties of fiduciary malfeasance after they have lawfully turned over property: "[a] person who in good faith pays or transfers to a fiduciary any money or other property, which the fiduciary is authorized to receive, is not responsible . . . ." R.I. Gen. Laws § 18-4-16 (emphasis added). The issue here – and one counterclaimants may have to address (see Section B, infra) – is whether Sinclair had a right to the disbursements ab origine.

And since crossclaimants have presented no evidence that ANICO had reason to know Sinclair's potentially unlawful designs, the Court will grant the company's summary-judgment motion as to their crossclaims.

B.  Sanctions

Federal Rule of Civil Procedure 37 lets district courts police discovery. The Rule allows courts to compel disclosures, depositions, and document production. Fed. R. Civ. P. 37(a)(3). It also provides tools to punish current and deter future recalcitrance – one of which is to "render[] a default judgment against the disobedient party." Id. at 37(b)(2)(A)(vi). Entering default is strong medicine, to be sure, but "nonetheless provides a useful remedy where, as here, a litigant is confronted by an obstructionist adversary." AngioDynamics, Inc. v. Biolitec AG, 780 F.3d 429, 436 (1st Cir. 2015) (quotation marks omitted).

Sinclair's brand of obstruction has been obscurantist. The sibling defendants lodged ten counterclaims against Sinclair, and have repeatedly asked her for related documents, only to be met by a mix of evasion and circumlocution. (See, e.g., Defs.' Mot. to Compel Produc. 1, ECF No. 96; Defs.' Mot. to Compel Further Resp. to Second Req. for Produc. 1, ECF No. 108; Pl.'s Resp. in Opp'n to Defs.' Mot. to Compel Further Resp. to the Second Doc. Req. 1-7, ECF No. 112.) The first set of requests went out April 5, 2017. (Defs.' Mot. to Compel Produc. 1, Ex. 1 at 1-5, ECF No. 96-1.)

12

After hearing nothing, the sibling defendants moved to compel and for sanctions. (Defs.' Mot. to Compel Produc. 1.) On July 18, 2017, the Court granted defendants' motion to compel, but denied sanctions. (Text Order, July 18, 2017.) Sinclair hardly lifted a finger in response to the Court's order, responding to her siblings' requests that she was without custody of any relevant documents. (Defs.' Mot. for Sanctions, Ex. 6 at 2-9, ECF No. 106-6.)

During this back-and-forth, the sibling defendants sent a second set of requests May 31, 2017, which elicited further dissembling. (See Defs.' Mot. to Compel Further Resp. to Second Req. for Produc. 1; id. at Ex. 1 at 1-2, ECF No 108-1.) Sinclair again stated that she had no responsive documents, and in fact blamed her brothers and sister for withholding documents from her, accusing that they stole them from their mother's home. (See Defs.' Mot. to Compel Further Resp. to Second Req. for Produc., Ex. 1 at 1-2.) She also responded that she could not turn over her tax returns because they were "under review by the IRS." (Id. at 2.)

On November 20, 2017, Magistrate Judge Almond, who was overseeing discovery, held an evidentiary hearing on a sanctions motion the siblings filed September 12, 2017. (R. & R. 2, ECF No. 149.) The motion sought to punish Sinclair for flouting the Court's July 18, 2017, order compelling her to respond to their

first set of discovery requests. (See Defs.' Mem. in Support of Mot. for Sanctions, ECF No. 106-1). The salient issue at the hearing was what truth there was to Sinclair's story about how and when her files – at least the ones requested by defendants – mysteriously disappeared from her mother's home. (R. & R. 2.)

Not much, it turned out. According to Magistrate Judge Almond, Sinclair's "position as to her personal and financial files simply does not add up." (Id. at 3.) Sinclair's telling of when she learned the files were missing had been a "moving target." (Id. at 6.) Sometimes the discovery happened November 2015, sometimes January 2016, and other times summer 2017. (Id. at 3-4.) That they went missing before July 26, 2016, was inconsistent with her having used various would-be responsive documents to bolster a creditor's claim she filed on her mother's estate on that date. (Id. at 5.) Whatever was left of Sinclair's credibility exited when she testified that she had "no idea why [she] would have said" so many conflicting things regarding her files' whereabouts. (Id. at 4.)

Impressed by Sinclair's continued appetite for misdirection, Magistrate Judge Almond found her behavior "serious and warrant[ing] sanction." (Id. at 7.) He therefore recommended the Court enter default against Sinclair as to her siblings' counterclaims, and an award of reasonable expenses incurred by the siblings in bringing their sanctions motion. (Id. at 8.)

The Court reviews Magistrate Judge Almond's recommendation de novo, Plante v. Fleet Nat'l Bank, 978 F. Supp. 59, 65 (D.R.I. 1997), but accepts his credibility determinations as rendered, see United States v. Hernández-Rodríguez, 443 F.3d 138, 147-48 (1st Cir. 2006). Given the facts recited above, and Magistrate Judge Almond's conclusion that Sinclair's testimony was "simply not credible," (R. & R. 6), the Court agrees with and adopts his recommendation. Sinclair has certainly proven to be an "obstructionist adversary": at the hearing, she was unable to provide any excuse for failing to comply with the Court's order compelling compliance with her discovery obligations; her "moving target" strategy could then be nothing other than a deliberate attempt to frustrate her siblings and prolong this litigation; and her flip answers when asked to explain inconsistencies suggest she had no plan to make a break from her history of prevarication. See AngioDynamics, 780 F.3d at 435–436 (listing "repetition of violations," "deliberateness of the misconduct," and "legitimacy of the party's excuse for failing to comply" as relevant to Rule-37-sanctions analysis). Default is well deserved.[5]

---

[5] Sinclair's new yarn that her siblings deleted the files they ask for from their mother's hard drive (Pl.'s Obj. to R. & R. 21, ECF No. 158) is the target moving once again – and certainly nothing that undermines Magistrate Judge Almond's recommendations. Nor is it an allegation that can support Sinclair's sanctions motion (ECF No. 195). Least among the motion's problems – its untimeliness – recommends denial. See (Standard Pretrial Order, ECF No. 18; Fed. R. Civ. P. 6 (b)(1)(B).

Note, however, this does not mean the sibling defendants prevail. What it means is that Sinclair can no longer dispute the facts stated in the siblings' counterclaims.[6] Hooper–Haas v. Ziegler Holdings, LLC, 690 F.3d 34, 41 (1st Cir. 2012) ("[O]nce the default is entered, so long as the complaint states a claim for relief, then the defaulted party has no further right to contest liability." (emphasis added)); see also Wright & Miller, supra, at § 2688.1. After appropriate briefing, the Court will decide whether these facts – taken as true – establish liability for the counterclaims pleaded. See Wright & Miller, supra, at § 2688.1 (noting that even when default has entered, "it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit conclusions of law"). In a word, the counterclaimants may now move for judgment, setting forth their argument with respect to liability. They may simultaneously move for damages, which Sinclair can contest without any limitation brought on by her default. See Hooper-Haas, 690 F.3d at 41 ("[E]ven a party in default is generally entitled to contest damages . . . .").

---

[6] As Sinclair may no longer gainsay sibling defendants' rendition of the facts related to their counterclaims, her request to supplement her expert's report (ECF No. 194) designed to do just that will be denied.

III. Not to Put Too Fine a Point Upon It

The Court GRANTS ANICO's, the sibling defendants' and Sampson's summary-judgment motions (ECF Nos. 151, 153, 155) as they regard Sinclair's claims. It GRANTS ANICO summary judgment as to the sibling defendants' crossclaims (ECF No. 151). All Sinclair's motions (ECF Nos. 182, 187, 194, 195) are DENIED. ANICO's bid to strike Sinclair's second batch of summary-judgment papers (ECF No. 177) is also DENIED, as moot. Finally, the Court ACCEPTS Magistrate Judge Almond's Report and Recommendation (ECF No. 149), defaulting Sinclair as to the sibling defendants' counterclaims, and awarding them their reasonable expenses and attorneys' fees incurred in the litigation of their sanctions motion (ECF No. 106). But alas! "The suit does not sleep; we wake it up, we air it, we walk it about," Dickens, supra, at 583: the Court awaits counterclaimants' motion for judgment and damages, due forty-five days from today's date.

IT IS SO ORDERED.

/s/ William E. Smith
_____
William E. Smith
Chief Judge
Date:  September 19, 2018